**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LIBERTY SURPLUS INSURANCE** | ) | |
| **CORPORATION, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0456-WS-M** |
| | ) | |
| **PATRIOT ASPHALT, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court for final resolution following bench trial.  For the reasons that appear below, the Court finds that the plaintiff/defendant is entitled to judgment in the amount of $341,003.62, plus prejudgment interest.

## BACKGROUND

Plaintiff Gulf Coast Asphalt Company, LLC ("the Dock") owns and operates a liquid asphalt facility on the Mobile River.  Defendant Penn Maritime, Inc. ("Penn") owns and operates the barge Acadia ("the Barge").[1]  On the morning of July 5, 2005, the Barge moored at the Dock's facility to receive a shipment of asphalt.  This substance can be loaded by flexible hose or by metal loading arm; on this date, loading was accomplished by loading arm.

The tankermen on the Barge were Frank Mahr and Chris Mahannah, who worked alternating shifts.  Mahr moored the Barge, but both were responsible for tending the lines thereafter.  Mahannah inspected the loading arm and attached it to the Barge's manifold to accept product.

---

[1]All other defendants have been dismissed.  The only other plaintiff is the Dock's subrogated insurer.

The loading arm consists of a base attached to the concrete dock; a riser; an inboard arm; and an outboard arm, the latter components connected by a joint that allows for various angles between them.  On the evening of July 5, 2005, while loading operations continued, that angle extended to 180 degrees when the Barge drifted west, away from the Dock.  The Barge then drifted back towards the Dock, causing the loading arm to be stressed and to fail at various points.

## DISCUSSION

As with most controversies, this one involves questions both of liability and of damages.  The Court considers them in that order.

## I.  Liability.

"An allision occurs when a moving vessel strikes a stationary object such as a dock."  *Fischer v. S/Y Neraida*, 508 F.3d 586, 589 n.1 (11th Cir. 2007).  Penn argues there was no allision because the Barge did not contact the dock.  (Doc. 102 at 4).[2]  There are two answers to this objection.  First, a dock is not the only stationary object the striking of which will constitute an allision.[3]  Second, the loading arm was permanently attached by bolts to the concrete dock and was effectively part of the dock.  Either as part of the dock

---

[2]A series of dolphins, each approximately twelve feet west of the dock, prevented any such occurrence.

[3]*See, e.g., Cranford v. United States*, 466 F.3d  955, 956 (11th Cir. 2006) (allision with submerged wreck); *Superior Construction Co. v. Brock*, 445 F.3d 1334, 1336 (11th Cir. 2006) (allision with barge); *Bunge Corp. v. Freeport Marine Repair, Inc*., 240 F.3d 919, 922-23 (11th Cir. 2001) (allision with grain loading facility); *In re: Amtrak "Sunset Limited" Train Crash*, 121 F.3d 1421, 1423 (11th Cir. 1997) (allision with railroad bridge); *Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1376-77 (11th Cir. 1982) (allision with submerged water pipeline); *Andros Shipping Co. v. Panama Canal Co.*, 298 F.2d 720, 721, 727 (5th Cir. 1962) (allision with canal bank).

or as a separate stationary object, the Barge's contact with the loading arm could constitute an allision.

No witness observed the motion of the loading arm preceding the accident. The experts agree that the loading arm extended to 180 degrees as the Barge drifted away from the dock,[4] but they disagree over what happened next. According to Penn's expert, the loading arm remained in the 180-degree position and the Barge, as it drifted back toward the dock, pushed the straight arm toward the dock, stressing the loading arm's attachment to the dock. (Transcript at 436-38). According to the Dock's expert, the loading arm inverted, with the apex angle now pointing down rather than up, and the Barge contacted the lowered apex of the loading arm and drove it back toward the dock, causing similar stress. (*Id.* at 303).

Although not urged by Penn, arguably no allision occurred under the version propounded by its expert, because the Barge's only contact with the loading arm was its pre-existing attachment at the manifold. Under the Dock's version, the Barge physically impacted the inboard and/or outboard arms of the loading arm and pushed it landward in what would clearly be an allision.

The Court finds that the Dock's expert accurately depicted the events of the accident for a number of reasons, including the following. First, Penn's expert offered no explanation why, despite the apparent free mobility of the joint between the inboard and outboard arms, the angle would remain frozen at 180 degrees. On the contrary, he insisted that, at 180 degrees, the swivel joint connecting the inboard and outboard arms "will not be able to hold" the arm steady. (Transcript at 404). Second, Penn insists that,

---

[4]Penn objects that the Dock's expert based his testimony as to drift is "incompetent" because based on improper materials. (Doc. 117 at 11). Since Penn's expert agrees that the Barge drifted enough to extend the loading arm to 180 degrees, (Transcript at 437), Penn's point is obscure. At any rate, Penn does not address Rule 703, which allows an expert to rely on a wide range of information. Finally, Penn did not object at trial to the expert's reliance on this material, (*id.* at 324-25, 368-70), and so waived any objection to it.

only a few hours earlier, the apex angle had in fact inverted.  (*Id.* at 169, 403).
Accordingly, the Court accepts the version of the accident sequence offered by the
Dock's expert and finds that the Barge allided with the loading arm.

"When a moving ship strikes and damages a stationary object, it is presumed that
the moving ship is at fault."  *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919,
923 (11th Cir. 2001).  As applied to drifting craft (as opposed to those moving under their
own power), this is known as the *Louisiana* Rule.  *E.g., Fischer*, 508 F.3d at 593.  "This
presumption operates to shift the burden of persuasion onto the moving ship."  *Freeport
Marine Repair*, 240 F.3d at 923.  Because the Barge allided with the loading arm, the
*Louisiana* Rule applies and a  presumption arises that the Barge was at fault.

There are only three ways in which Penn can rebut the presumption that it was at
fault.  First, it can prove "that the moving vessel acted with reasonable care."  Second, it
can prove "that the allision was the fault of the stationary object."  Third, it can prove
"that the allision was an unavoidable accident."  Whatever avenue it pursues, Penn must
make its showing "by a preponderance of the evidence."  *Freeport Marine Repair*, 240
F.3d at 923.

Penn does not assert that the allision was an unavoidable accident.  *See generally
Fischer*, 508 F.3d at 596 (requiring the defendant to show that "the accident would have
happened anyway regardless of what the defendant did" and that "all reasonable measures
would have been futile").  It does, however, argue that it was not at fault, and that the
Dock was at fault, in causing the allision.

### A.  Fault of the Barge.

"The duty of care owed by a moving vessel to a stationary object is reasonable
care under the circumstances."  *Fischer*, 508 F.3d at 593.  While the Dock stresses that
the *Louisiana* Rule's presumption of fault is "strong" and that Penn carries a "heavy

burden" to overcome it,[5] these adjectives simply "impos[e] a burden of persuasion upon the defendant"; they do not require the defendant "to prove that it did more than what is merely reasonable in order to avoid liability." *Id.* at 595. "Thus, if a ship's owner acted reasonably in preparing for a storm, the owner is not liable even if the ship eventually causes damage to another's property." *Id.* at 593. "Reasonable care in this context is that of prudent men familiar with the ways and vagaries of the sea." *Id.* at 596 (internal quotes omitted); *accord Hercules, Inc. v. Stevens Shipping Co.*, 698 F.2d 726, 737 n.25 (11th Cir. 1983) (tug's duty to tow is "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service") (internal quotes omitted).[6]

Penn offered no evidence of what constitutes reasonable care to avoid dangerous drift. The Dock, however, submitted excerpts from two manuals propounded by Penn and distributed to its tankermen, which its employees confirmed they are required to follow. (Transcript at 136-37, 147, 216). Among the directions contained therein are the following:

- "After the [loading] arms have been connected, mooring lines should not be allowed to slacken because the barge's movement cannot be greater than the reach of the arm."

- "Sufficient mooring lines in good condition and of adequate size should be used to ensure that the vessel will remain within the operating envelope of loading arms and/or hoses and will not break away due to sudden changes in wind or sea conditions or by surging caused by passing vessels."

---

[5](Doc. 116 at 13) (quoting *Freeport Marine Repair*, 240 F.3d at 923)).

[6]The Court rejects the Dock's assertion that Penn is required to "exhaust every reasonable possibility which the circumstances admit." (Doc. 119 at 6). The quoted language applies only to the "unavoidable accident" rebuttal of the *Louisiana* presumption, *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977), and so is inapplicable here.

- "Frequent checks should be made to insure that mooring lines are tight to keep the vessel securely alongside."

- "Lines must be routinely checked to allow for changes in tide and draft."

(Plaintiff's Exhibits 1, 2).

Penn does not argue that its manuals represent something above and beyond reasonable care.  While it is doubtful that any such argument would have succeeded, Penn's failure to make the argument obviates further consideration.  On the record and argument presented, the Court finds that Penn's manuals reflect what constitutes reasonable care by the Barge when tied up to accept product from the Dock.  Reasonable care thus required Penn to keep the Barge securely alongside, without slackened lines, so that the loading arm's operating envelope would not be exceeded.

Satisfaction of Penn's duty required it to be aware of the loading arm's operating envelope, since that measurement established the limit of acceptable drift.  The tankermen were not aware of the loading arm's operating envelope, (Transcript at 222), and thus violated their duty to be so aware.[7]

Penn's ignorance of the operating envelope would be immaterial had its tankermen nevertheless kept the Barge within that envelope, but they did not.  The operating envelope of the loading arm corresponded with an angle between its inboard and outboard arms of 150 degrees, (Defendant's Exhibit A at 21-22; Defendant's Exhibit A-11), and the accident occurred when the Barge drifted out sufficiently to extend the loading arm to 180 degrees, then drifted back in.

Penn might still have satisfied its duty of reasonable care had the drift beyond the loading arm's operating envelope occurred despite the tankermen's exercise of reasonable care to avoid that result.  But the reasonable care the tankermen were bound to exercise

---

[7]There is no evidence that the tankermen inquired about the operating envelope or that the Dock refused to provide requested information, and the Court finds that neither occurred.

-6-

after initially mooring the Barge was to check and tighten the lines with sufficient frequency that the Barge would not drift beyond the operating envelope, and the Court finds that they did not do so.

Mahannah testified that his practice is to check the lines every ten or fifteen minutes.  (Transcript at 228).  The Court finds that this time period represents the minimum frequency required to satisfy the Barge's duty to check the lines "routinely" and "frequently."   However, Mahannah testified that he did not know how long before the accident it had been since he last checked the lines, (*id*. at 212), and the Court finds that he had not checked the lines within the fifteen minutes prior to the accident.  Mahannah therefore breached his duty to check the lines routinely and frequently.[8]

Moreover, checking the lines without tightening them as needed accomplishes nothing, yet neither tankerman testified that he ever tightened the lines during the loading operation.  Their insistence that the lines were always tight, (Transcript at 155, 213-14), is not testimony that they affirmatively tightened the lines but only that they never needed tightening (an utterly implausible suggestion, given the many influences on the Barge's position, as described below).  Even could their testimony be construed as denoting that they had tightened the lines at some relevant point prior to the accident, the Court would discredit the testimony, as neither witness was credible in his demeanor or presentation.  In addition, as discussed in Part I.B., the Barge drifted at least three to five feet before exceeding the loading arm's maximum safe operating angle of 150 degrees.  There was no evidence that the Barge could have drifted so far had Mahannah actually tightened the

_____

[8]Mahr offered no testimony as to how often he checked the lines.  Although Mahannah claimed that Mahr followed the same timetable for checking lines, (*id*. at 228), he could not have personal knowledge of Mahr's practice because the two worked different shifts.  (*Id*. at 132).  At any rate, only Mahannah had been on duty for almost two hours before the accident, so it is his conduct that matters.

lines within the fifteen minutes preceding the accident.[9]  Mahannah's testimony that the lines were tight immediately after the accident, (Transcript at 213, 228), is rejected as contrary to the physical fact of the drift and allision.  The Court finds that Mahannah did not tighten the lines at any time reasonably near the accident and that his failure to do so allowed the loading arm's operating envelope to be exceeded.

Reasonable care must be measured in light of "the circumstances."  The circumstances present on the evening of July 5, 2005, included the following, which the Court finds as facts: (1) the Barge failed to utilize MD-2 for a breasting line;[10] (2) the Barge failed to utilize the recommended full complement of 12 lines;[11] (3) the Barge's draft increased by seven to nine feet after loading operations began;[12] (4) the tide rose by over a foot after loading operations began;[13] (5) Tropical Storm Cindy was approaching, resulting in the harbor being closed the morning following the accident;[14] (6) a north wind of nine or ten miles per hour, with gusts up to 18 miles per hour, prevailed;[15] and (7) an ocean-going vessel passed the Barge just before the accident.[16]  Each of these circumstances enhanced the potential for drift.  Penn does not argue that any of these circumstances, or any others, lowered its duty of reasonable care, and they plainly did not.

---

[9]Even were there such evidence, it would show only that reasonable care required the tankermen to check and tighten the lines more frequently than they claim to have done.

[10](Transcript at 196).

[11](*Id*. at 217).  The Barge used ten lines instead.  (*Id*.).

[12](*Id*.  at 202-04).

[13](*Id*. at 407).

[14](*Id*. at 199; Plaintiff's Exhibit 3).

[15](Transcript at 199-200, 304).

[16](*Id*. at 211).

The first and last of these circumstances affirmatively enhanced Penn's duty of care.  MD-2 was positioned east of, and perpendicular to, the Barge, and it would have provided excellent restraint against lateral drift of the forward part of the Barge away from the dock.  The dolphins the Barge employed were basically parallel to the Barge and offered minimal lateral restraint.  (Transcript at 306-07).  Even if it was not negligent for the Barge not to utilize MD-2, the failure to do so increased the risk of excessive drift and heightened the need to keep the remaining lines tight.

As Penn recognized and advised its tankermen, passing vessels can cause sudden movement sufficient not merely to overextend a loading arm but to cause a barge to break away from its moorings.  (Plaintiff's Exhibit 2).   The Dock's expert agreed with defense counsel that a passing vessel "will add to the movement of the [Barge]" and  "can cause some significant movement."  (Transcript at 327).  A large, ocean-going vessel passed the Barge moments before the accident, (*id.* at 211), the approach of which should have prompted Mahannah to immediately check and tighten the lines to ensure the vessel's wake would not cause unacceptable movement (especially given the absence of a stabilizing line to MD-2).  Mahannah, however, did nothing, even though Penn's manual put him on notice of the danger passing vessels pose, and even though he did not know when he had last checked the lines.  Instead, he continued gazing at the shore, roused from his reverie only by the sound of the dock fracturing.  (*Id.* at 210-11).  The Court finds that the passing vessel posed a special hazard of which Mahannah was or should have been aware, that it placed on him a duty to immediately ensure that all lines were tight (which they were not), and that he failed to do so.  The Court further finds that the passing vessel caused the Barge to drift away from the dock and then back towards the dock, causing the allision.[17]

_____

[17]The Court rejects Mahannah's testimony that the vessel caused no Barge movement, (Tr. 228), both because of the general unreliability of his testimony and because he admittedly was not paying attention to his environment until the damage was already occurring.

In short, the Court finds by a preponderance of the evidence that Penn breached its duty of reasonable care by failing to keep the lines adequately tight.  The Court further finds by a preponderance of the evidence that this breach of duty, which directly and immediately resulted in the allision, was its proximate cause.[18]

### B.  Fault of the Dock.

"Where a berthing facility has been damaged, the shipowner may rebut the presumption of negligence by proving that the wharfinger violated the standard of care to which he is held and that this violation was the proximate cause of the damage claimed." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795-96 (5th Cir. 1977).  The Dock's duty is one of reasonable diligence.  *Id.* at 796.[19]

---

Penn argues that the prior collapse of the loading arm around 2:00 p.m., which likewise included an inverted apex angle (and thus an extension to 180 degrees), proves that the later accident did not result from excessive drift, because Mahr testified that the lines were tight at the time of the earlier collapse.   (Doc. 117 at 18).  The Court rejects Mahr's testimony as to the tightness of the lines, because his demeanor suggested evasiveness and poor memory, because he did not affirmatively testify that he tightened the lines at any point, and because neither he nor the experts could devise any explanation for the collapses other than vessel drift.

[18]Because the preponderance of the evidence establishes Penn's fault, the shifting of the burden of proof resulting from the *Louisiana* Rule does not affect the Court's decision; the Court would have found Penn at fault even if the Dock bore the burden of proof.

[19]The Court rejects the Dock's assertion that the only duty of a wharfinger is to warn of hidden hazards or defects.  (Doc. 116 at 14).

Penn bears the burden of proving that the Dock was negligent and that its negligence proximately caused the accident, not simply because of the *Louisiana* Rule but because "it is always the defense's burden to plead and prove a plaintiff's comparative fault under any theory of liability."  *Neely v. Club Med Management Services, Inc.*, 63 F.3d 166, 200 (3rd Cir. 1995).  Thus, as with Penn's fault as found under Part I.A, the Court's decision as to the Dock's fault would not change even if there had been no allision.

Penn argues that the Dock violated its standard of care by utilizing a loading arm that was "unfit" for the purpose.  It was unfit, Penn says, because it was too short to load product while remaining within its safe operating envelope, i.e., the area encompassed by the loading arm when operating within the maximum safe working angle between its inboard and outboard arms.  (Doc. 102 at 1-2, 4-5; Doc. 117 at 13, 16-17).[20]

Penn proceeds from the assumption that the maximum safe working angle was 120 degrees.  (Doc. 117 at 7, 9, 16).  For this proposition, it relies on a portion of the deposition testimony of the representative of the loading arm's manufacturer.  While he did initially indicate that the maximum safe working angle was 90 to 120 degrees, (Defendant's Exhibit A at 16, 20), he then clarified that 90 to 120 degrees represents "the normal operating" angle, with "the maximum safe working angle" being 150 degrees, (*id.* at 21), and he repeatedly hewed to that figure.  (*Id.* at 22, 28-29).[21]  The Court finds that the loading arm's maximum safe working angle was 150 degrees.[22]

The parties' experts agreed that the angle did not exceed 150 degrees even when the loading arm was initially hooked up on the morning of July 5, 2005.  (Transcript at 348, 421-22, 431-32).  As the Barge took on product, its draft increased and freeboard

---

[20]The maximum safe working angle denotes the point above which a loading arm can be stressed.  (Defendant's Exhibit A at 22-23; Transcript at 349).

[21]He also testified that the "maximum reach envelope" noted in the manufacturer's drawings constitutes  "[t]he safe working envelope" and that the maximum reach envelope reflects a 150-degree angle.  (*Id.* at 21-22; Defendant's Exhibit A-11).

[22]Penn's expert testified that the loading arm's safe working angle was 90 to 120 degrees.  (Transcript at 381-82, 401-02).  The Court rejects this testimony because: the expert admitted that this is not universally the range but only "usually" so; he never explained why the "usual" range necessarily applied to this loading arm; he never inspected the loading arm or identified any experience with this manufacturer's loading arms; and he never explained why the manufacturer's own identification of the maximum safe working angle as 150 degree was not worthy of credence.  (*Id.* at 401, 416-17).  Furthermore, he agreed with the Dock's expert that operating between 120 and 150 degrees is generally safe.  (*Id.* at 348-49, 422).

decreased, (*id*. at 202, 429), until, by the time of the accident, the angle was below 118 degrees. (*Id*. at 311-12).[23]

Penn also argues that, even if the maximum safe angle of 150 degrees was not exceeded when operations began, it clearly was exceeded immediately before the accident and that the Dock had a duty of reasonable care to avoid such an occurrence. The experts agree that even a properly moored vessel cannot be made to remain perfectly still, (Transcript at 322, 408-09), which suggests that some degree of inevitable vessel movement must be anticipated and accommodated by the Dock. The Court therefore accepts that the Dock had a duty to exercise reasonable diligence to keep the angle below 150 degrees despite the inevitable movement of a properly moored vessel.[24]

Penn, however, has not established that the Dock was in violation of this duty when the accident occurred. Assuming without deciding that the angle when operations began was close to 150 degrees, leaving little margin for vessel movement (although neither expert so testified), and assuming without deciding that this would reflect a breach of the Dock's duty of reasonable care, the Court finds that it was not a proximate cause of the damage at issue, which occurred some twelve hours after operations began. (Plaintiff's Exhibit 3). Likewise, although the angle exceeded 150 degrees at the time of the first collapse of the loading arm, this occurred almost five hours before the accident,

---

[23]Penn's expert did not calculate the angle at the time of the accident. (Transcript at 432). The angle as calculated by the Dock's expert was even less than 118 degrees, because he assumed the manifold was 17.5" further from the side of the Barge than it actually was. (*Id*. at 314).

[24]To the uncertain extent that Penn suggests the Dock had a duty to anticipate and guard against additional movement resulting from improper mooring, the Court rejects the proposition as unsupported and as an improper attempt to shift to the Dock the responsibility for Penn's negligent failure to keep its lines tight.

The Court rejects as unsupported the Dock's suggestion that it bore no duty with respect to determining whether the loading arm was long enough for the job because Penn's manuals placed that duty on the Barge. (Doc. 116 at 17).

and the Court finds that it was not a proximate cause of the damage at issue.[25]

At the time of the accident, the angle to the Barge, snug to the dock and properly aligned with the loading arm, was under 118 degrees. It required drift of approximately five to ten feet to extend that angle to 180 degrees. (Transcript at 319).[26] The Court finds that the drift required to extend the angle to 150 degrees was roughly half, or three to five feet. Penn failed to establish that a properly moored vessel has an inevitable drift of three to five feet. It thus failed to establish that the Dock had a duty to keep the angle below 150 degrees in the face of such drift.[27]

Penn appears to suggest that the Dock was required to anticipate six feet of drift, because the manufacturer utilized this figure in its reach range diagram. (Doc. 117 at 10, 11; Defendant's Exhibit A-11; Transcript at 409, 413). As Penn's expert testified,

---

[25]Penn suggested that the first collapse could have caused damage to the loading arm, which then caused the second collapse, but its expert conceded this was a mere possibility, of which he has no evidence. (Transcript at 405, 439-40). The Court finds that no such damage occurred during the first collapse.

To the uncertain extent that Penn suggests the Dock was negligent in failing to shut down the operation after the first collapse, (Doc. 117 at 18-19), the Court rejects it, as Penn failed to show that the circumstances required the Dock to do so in the exercise of reasonable diligence. Even if the failure constituted negligence, the Court finds that it was not a proximate cause of an accident occurring almost five hours later.

[26]Actually more, because the 118-degree figure, and the five- to ten-foot estimate derived from it, assumed the manifold was further from the Barge's side than it was. (*Id*. at 314).

[27]The discussion in text is perhaps overly generous to Penn. The relevant angle at the time of the accident was not 150 degrees but 180 degrees. The former figure is significant because it is the threshold at which the loading arm may begin to undergo stresses that can cause collapse. (Defendant's Exhibit A at 22-23). But the accident at issue did not result from such stresses but from the loading arm inverting (because it reached 180 degrees) and being thrust back to the dock, displacing the arm from the dock. It was thus Penn's burden to show that a properly moored vessel can be expected to drift five to ten feet. Because Penn failed to show even that a properly moored vessel will drift three to five feet, it necessarily failed to make the more stringent showing as well.

-13-

however, this distance reflects the "flanging area" (the range of manifold locations expected at the berth) in addition to the manufacturer's drift allowance. (Transcript at 393-94). The drift allowance is thus necessarily less than six feet, and Penn offered no evidence to show how much of the six feet represents drift allowance. Nor was there any showing that the six feet, even if all attributable to drift, represents the drift expected of a properly moored vessel. On the contrary, Penn's expert testified that the six-foot figure is there "to account for anything beyond those motions" of "a vessel that's tightly moored to a dock." (*Id*. at 409).[28] The Court rejects for want of adequate supporting evidence any suggestion that the Dock was under a duty to exercise reasonable diligence to keep the angle below 150 degrees in the face of drift of three feet or more.[29]

Penn argues that the Dock violated three regulations and that these violations are evidence of the Dock's negligence. (Doc. 117 at 13-14, 17-18). The first of these prohibits transfer operations unless "[t]ransfer hoses and loading arms are long enough to allow the vessel to move to the limits of its moorings without placing strain on the hose, loading arm, or transfer piping system." 33 C.F.R. § 156.120(b). Penn did not establish that the Dock violated the regulation because it did not show that, even upon initial hookup, the unavoidable drift of a properly moored vessel would extend the angle above 150 degrees. Even if there were a violation of the regulation initially, it was not a proximate cause of an accident occurring some 12 hours later. By the time of the

----

[28]Penn's expert did not calculate a minimum amount of drift against which the Dock was required to defend but simply relied on the six-foot figure in the reach range diagram. (*Id*. at 408). As noted in text, that figure says nothing about the inevitable degree of drift. Moreover, the expert conceded that devising a drift parameter is "specific to the water," (*id*. at 407), yet he neither claimed to have performed a location-specific analysis of drift potential nor asserted that the manufacturer had done so.

[29]Penn speaks at times of surge, including in its discussion of the reach range diagram, but it offered no evidence of any such surge. Because the Barge's mooring configuration was well suited to secure against surge but not against drift, the Court finds that all of the Barge's movement was from drift.

accident, the loading arm was long enough to allow for the inevitable movement of a properly moored vessel without straining the loading arm, and Penn did not offer to show that the regulation requires more than that.

The second regulation deals with the qualifications of dockmen. 33 C.F.R. § 154.710. Again, Penn did not prove that the dockman was unqualified; instead, it argued that the Dock failed to prove he was qualified. (Doc. 117 at 14). The burden, however, was on Penn, not the Dock, and Penn admits the dockman's qualifications "are unknown." (*Id.* at 2).[30] Finally, Penn did not attempt to show that any violation of this regulation, even if evidence of negligence, proximately caused the accident, and the Court finds that it did not.

The third regulation prohibits transfer operations unless the terminal conducts them in accordance with its operations manual. 33 C.F.R. § 156.120(u)(2). Penn argues the Dock violated this provision because its manual states that the facility services barges with a capacity of 7,000 to 70,000 barrels, while the Barge had a capacity of 154,000 barrels. (Doc. 117 at 17-18). Penn did not show that the regulation limits the size of vessels a facility can service to the size listed in the manual, such that servicing a larger vessel violates the regulation. Neither did it show that servicing a 154,000-barrel barge violates the regulation when the manual also states, as does the Dock's, that the facility services tankers exceeding 150,000 barrels. Finally, Penn ignores proximate cause, and the Court finds there was none.

Even had Penn proved a violation of any of the regulations, it would not alter the Court's findings that the Dock was not negligent and that any negligence was not a proximate cause of the accident.

_____

[30]Penn cites to testimony it believes establishes that the dockman was not trained as to the safe operating envelope. (Doc. 117 at 21). Because counsel cut off the witness's answer as he appeared to be stating that he did not know what the dockman's training was, (Transcript at 278-79), the Court finds an absence of evidence that the dockman was not trained in any relevant respect.

Finally, Penn notes that a wharfinger's duty includes the duty to "warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner," and it complains that the Dock did not notify the tankermen of the safe operating envelope of the loading arm.  (Doc. 117 at 13 (quoting *M/V Furness Bridge*, 558 F.2d at 796)).  As the Court has already found, the maximum safe working angle was 150 degrees, and the loading arm did not exceed that angle even when first attached to the Barge's manifold.  It is thus doubtful that there was any "deficiency" the Dock was bound to disclose.  Even if the Dock violated a duty to notify the tankermen, Penn presented no evidence that the tankermen would have done anything differently had they possessed this information.  The Court finds they would not have, especially since they did not know what a safe operating envelope is.  (Transcript at 226-27).  Accordingly, the failure to tell the tankermen of the loading arm's safe operating envelope was not a proximate cause of the accident.

In sum, the Court finds by a preponderance of the evidence that the Dock did not violate its standard of care and that its alleged misconduct was not a proximate cause of the accident.

## II. Damages.

The *Louisiana* Rule does not shift to the defendant the burden of proof concerning damages.  *See, e.g., United States v. Capital Sand Co.*, 2005 WL 1668141 at *3 (E.D. Mo. 2005).  The Dock acknowledges that it retains this burden.  (Doc. 103 at 13).

The Dock claims the following elements of damages:

- Dock repair                              $179,638
- Damage to the loading arm   100,000
- Damage to the piping                20,258

| | | |
|---|---|---|
| • | Cleanup | 48,000 |
| • | Prejudgment interest | <u>35,436</u> |
| Total | | $383,332 |

(Doc. 93 at 34; Doc. 116 at 1).  The Court considers these elements in turn.


### A.  Dock Repair.

Jordan Pile Driving ("Jordan") submitted a bid of $179,638 for dock repairs.
(Plaintiff's Exhibit 7A).  The Court finds that the proposed repairs were accomplished
and that the Dock paid the bid amount for those repairs.  (Transcript at 21-24).

Penn complains that the repairs included snap-testing six timber piles to verify
they were broken, removing them, and driving new ones, yet the dive report revealed no
damage to any pilings near the loading arm but only at the south end of the dock, the part
furthest from the loading arm.  Penn concludes that the Dock failed to prove that the
damage to these southern pilings was caused by the accident.  (Doc. 117 at 11-12, 16).
Penn is correct, but the southern pilings are not the ones the Dock replaced.  After
receiving the dive report, Jordan opined that six pilings were broken below the mud line,
which damage would not be disclosed by a diver but only by a pull test or snap test.
(Plaintiff's Exhibit 7C).  The Court finds that Jordan was referring to the six pilings at the
northern end of the dock, nearest the accident site, and that these six pilings were tested,
removed, and replaced.  Penn does not argue that damage to these pilings was not from
the accident, and the Court finds that it was.

Penn stipulated that the repairs were reasonable and necessary, (Transcript at 313),
and the Court so finds.

Penn argues that, because the dock was completely rebuilt following extensive
damage from Hurricane Katrina in August 2005, the Dock has received "new for old" and
that its award for dock repairs must be reduced by the amount of the improvement.  (Doc.
102 at 7; Doc. 117 at 16).  The trouble is that the $179,638 the Dock requests for dock

repair is not the amount it took to rebuild the dock after Katrina but the amount it would have taken to repair the damage the Barge did, had Katrina not arrived before those repairs could occur.  The mere fortuity of an intervening hurricane does not lessen Penn's liability for damages.

Penn could still invoke this "improvements" rule if the repairs contemplated by the $179,638 would have increased the value of, or extended the useful life of, the dock. *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304-05 (5th Cir. 1976); *Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973), *amended on other grounds on rehearing, Canal Barge Co. v. Griffith*, 513 F.2d 911 (5th Cir. 1975).   Penn accepts that it bears the burden of making this proof, (Doc. 117 at 16),[31] yet it produced no evidence that could do so.  Even if it could be assumed (which it cannot) that the dock repair would have extended the useful life of the repaired portion of the dock, this would be immaterial without further proof that, even when the undamaged remainder of the dock exhausted its useful life and required rebuilding, the repaired portion of the dock would be left standing rather than being rebuilt as well.[32]  There is no such evidence.  In short, the Court finds that the cost of repairing the Dock did not increase its value or extend its useful life and that no reduction of the repair cost to be awarded as damages is warranted.

### B.  Damage to the Loading Arm.

The Court finds that the Dock paid the manufacturer $32,617.77 for parts to repair

---

[31]This appears to be the law.  *See Freeport Sulphur*, 526 F.2d at 304 ("The only betterment to Freeport's dock that was proved is the extension of its remaining useful life.").

[32]*See Freeport Sulphur*, 526 F.2d at 305 (discussing with approval a Ninth Circuit case in which depreciation was not required for a repaired bridge pier because it would have to be replaced when the bridge was replaced); *see also Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505-06 (5th Cir. 1994) (citing *Freeport Sulphur* and following the Ninth Circuit case).

the loading arm.  (Transcript at 33; Plaintiff's Exhibit 11A).  The Court finds that the Dock paid another entity $13,280 for labor and equipment to repair the loading arm. (Transcript at 35-36; Plaintiff's Exhibit 10).  The Court finds that the Dock paid a third entity $50,000 to ship the loading arm off for repair and to reinstall it following repair. (Transcript at 36, 38-39).[33]  Penn stipulated that the repairs were reasonable and necessary, (Transcript at 313), and the Court so finds.

### C.  Damage to the Piping.

The Court finds that the Dock paid a third party $20,258 to repair pipe insulation damaged in the accident.  (Transcript at 247, 250-51).  Penn stipulated that the repairs were reasonable and necessary, (Transcript at 313), and the Court so finds.

### D.  Cleanup.

Once the loading arm was damaged, asphalt product spilled from it onto the dock and into the Mobile River.  The Court finds that the Dock paid a third party $45,209.85 for cleanup of the spill.  (Transcript at 248-50; Plaintiff's Exhibit 8).  Penn stipulated that the cleanup costs were reasonable and necessary, (Transcript at 313), and the Court so finds.

### E.  Prejudgment Interest.

"As a general rule, pre-judgment interest should be awarded in admiralty cases. ... The court has the discretion to deny pre-judgment interest only when peculiar

---

[33]Penn complains that the witness pegged the amount as "somewhere around" $50,000 and that this figure was not corroborated by any documentary evidence.  (Doc. 117 at 12).  It cites no authority for the proposition that either inexactitude by one possessing personal knowledge, or the absence of confirming documents, precludes reliance on an estimated figure.  *See generally Elaine Jones*, 480 F.2d at 24 (reasonable estimates based on relevant data may be employed when exact figures are unascertainable).

circumstances make it inequitable for the losing party to pay pre-judgment interest." *Insurance Co. of North America v. M/V Ocean Lynx*, 901 F.2d 934, 942 (11th Cir. 1990) (internal quotes omitted). Penn identifies no peculiar circumstances that could justify not awarding prejudgment interest,[34] and the Court concludes that none exist. Therefore, the Dock is entitled to an award of prejudgment interest.

"The rate of pre-judgment interest that should be awarded is the prime rate during the relevant period." *Sunderland Marine Mutual Insurance Co. v. Weeks Marine Construction Co.*, 338 F.3d 1276, 1280 (11th Cir. 2003). While the Dock specified in its post-trial brief an amount of prejudgment interest requested, it did not explain how its calculation was made and did not provide adequate information for the Court to make an award for the post-trial period. Moreover, the requested amount assumes an award of all damages sought, but the Dock is not receiving the entire amount of damages requested.

Accordingly, the Court will enter judgment without a figure for prejudgment interest. Should the Dock desire an award of prejudgment interest, it is **ordered** to file and serve, on or before **March 4, 2009**, a motion to amend the judgment to include such an award in a sum certain. Before filing such a motion, counsel for the Dock shall confer with counsel for Penn in a good-faith effort to agree on the appropriate amount. If that effort is successful, the Dock shall state in its motion that Penn does not oppose the motion. If the effort is unsuccessful, the Dock shall accompany its motion with a brief detailing how the requested amount was calculated in conformity with prevailing law.

## CONCLUSION

For the reasons set forth above, the Court finds that Penn is liable to the Dock in the amount of $341,003.62, plus prejudgment interest to be awarded, upon request, by subsequent order. Judgment shall be entered accordingly by separate order.

---

[34]Penn argues only that interest should not be awarded if both parties were at fault. (Doc. 117 at 16). As discussed in Part I.B, the Dock was not at fault.

DONE and ORDERED this 20th day of February, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE